## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAULA CARTER,<br><br>*Plaintiff*,<br><br>v.<br><br>ANTONY J. BLINKEN,[1]<br>Secretary of State,<br><br>*Defendant*. | No. 19-cv-1202 (DLF) |

## MEMORANDUM OPINION

Paula Carter brings this action against Antony Blinken, the Secretary of the U.S.

Department of State, pursuant to the Rehabilitation Act, Title VII of the Civil Rights Act, and the

Age Discrimination in Employment Act (ADEA).  Carter alleges that her supervisors in the

Department failed to accommodate her disability; discriminated against her based on her race,

age, disability, and color; retaliated against her for engaging in protected activity; and created a

hostile work environment.  Before the Court is the Secretary's Motion for Summary Judgement,

Dkt. 23.  For the following reasons, this Court will grant that motion.

## I.      BACKGROUND

### A.      Factual Background

Carter is a black African American female who is over forty years old.  *See* Def.'s Mot.

for Summ. J. Ex. 1 (Carter EEO Aff.) at 3, Dkt. 23-3.  She has been diagnosed with both

congestive heart failure and heart and lung disease.  *See id.* at 3–4.  When she filed this action,

---

[1] When this complaint was filed, Michael Pompeo was the Secretary of the Department of State.
When Antony Blinken became Secretary, he was substituted pursuant to Fed. R. Civ. P. 25(d).

she had been working in the Special Issuance Agency for at least twenty-four years and had

worked as a Customer Service Manager for approximately twelve years.  *See* Def.'s Mot. Ex. 6

(Formal Compl. of Discrim.) at 4, Dkt. 23-8.  She alleges that her duties included "traveling all

over the world to teach the military and federal passport agents the procedures for accepting the

passport applications and other related topics."  Am. Compl. ¶ 31, Dkt. 17.

Carter has had multiple supervisors at the Agency.  They included Dan Alessandrini,

Michael Ma, and Eugene Arnold, who were Assistant Directors of the Agency, *see* Def.'s Mot.

Ex. 11 (Alessandrini Decl.) ¶¶ 2–3, Dkt. 23-13; Def.'s Mot. Ex. 3 (Ma EEO Aff.) at 1–2, Dkt.

23-5; Def.'s Mot. Ex. 10 (Arnold EEO Aff.) at 1–2, Dkt. 23-12, and Christine Harold, who was

hired as the Agency's Director in September 2014, *see* Def.'s Mot. Ex. 7 (Harold EEO Aff.) at

1–2, Dkt. 23-9.  Both Ma and Harold were aware of Carter's medical condition.  *See* Ma EEO

Aff. at 3; Def.'s Mot. Ex. 15 (Harold Dep.) at 12:6–14:16, Dkt. 23-17.  In addition, the Secretary

admits that Alessandrini, Arnold, and Harold were aware that Carter was a witness in another

employee's EEO action.  *See* Am. Compl. ¶¶ 96–98; Answer ¶¶ 96–98, Dkt. 18.

Carter took leave from the Agency in 2013 after having lung surgery.  *See* Ma EEO Aff.

at 2; Carter EEO Aff. at 9.  When she returned, she asked Ma to install blinds in her office

because her medical condition requires the use of an oxygen tank and "[h]aving the blinds

[would] allow [her] to work freely and comfortabl[y] while on oxygen without being

embarrassed or distracted."  Carter EEO Aff. at 9.  Although Ma declined to order the blinds

himself, *see id.*, he directed her to the Agency's "office of reasonable accommodations," Def.'s

Mot. Ex. 4 (Carter Dep.) at 29:4–19, Dkt. 23-6.  Carter went to that office "but never completed

all of the paperwork."  Def.'s Statement of Undisputed Material Facts ¶ 6 (quoting Def.'s Mot.

Ex. 2 (Pl.'s Responses to Def.'s Interrogatories) at 3, Dkt. 23-4).  She later described the

Agency's process for requesting an accommodation as "too much confusion . . . especially when you have already been diagnosed by a medical doctor." Carter EEO Aff. at 9.

In July 2015, Carter conducted a training in Alaska with Passport Specialist Mamie Minor. *See* Carter EEO Aff. at 11. Before the trip, on June 22, 2015, Harold contacted Carter about her travel documents, which indicated that she planned to spend an additional day in Alaska after the training's completion. *See* Def.'s Statement of Facts ¶¶ 8–9. Carter responded that she would pay the additional cost of staying for that extra day. *See id.* ¶¶ 10–11. Later, following the trip, Carter requested reimbursement for the costs of staying that additional day. *See id.* ¶¶ 14–15. When Harold questioned those expenses, Carter replied that "time [did not] permit [her] to come back" a day sooner because she had to "pack up materials" from the previous days' trainings. Harold EEO Aff. at 28; *see also* Def.'s Statement of Facts ¶¶ 16–17. She also criticized Harold for "scrutinize[ing] [her] travel" expenses and "act[ing] like Blacks don't have money to travel or go on trips." Harold EEO Aff. at 27–28. Carter later agreed to pay the expenses related to the additional day. *See* Def.'s Statement of Facts ¶ 20. Minor, who also chose to spend additional days in Alaska, was similarly required to pay her own additional expenses. *See id.* ¶¶ 18–19.

In December 2015, Carter told Harold that she would not conduct a training with the Coast Guard in California, as she had been previously scheduled to do. *See id.* ¶ 29; Def.'s Mot. Ex. 9 (Marjorie Ames EEO Aff.) at 18, Dkt. 23-11. The trip was scheduled for January 2016, and Carter had previously believed that she would conduct the training with Minor. *See* Def.'s Statement of Facts ¶¶ 28–29. But on December 28, 2015, when Harold emailed Carter to obtain clarification of her travel dates, *see id.* ¶ 28, Carter responded: "I have been informed that you said . . . Mamie Minor cannot go on this training with me. For what reason I do not know. I am

informing you that I will not be able to attend either.  The bullying must stop," *id.* ¶ 29.  Harold replied that Minor was not attending the training because she had travelled to Alaska within the previous six months and the Agency wanted a "larger group of GS-11s [to be] given an opportunity."  *See* Ames EEO Aff. at 18.  She also asked Carter to confirm whether she would conduct the training in Minor's absence.  *See id.*  Carter did not respond to that email or a subsequent voicemail from Arnold, who was then her immediate supervisor.  *See id.* at 26.

On January 4, 2016, Harold informed Carter that she had scheduled another employee to conduct the training.  *See id.*; *see also id.* at 21 (Carter noting that the other employee was an Assistant Director, not a Customer Service Manager).  Harold also told Carter that Agency management was requesting disciplinary action "based upon [her] failure to follow management instruction [with] regards to conducting the training."  *Id.* at 22.  The next day, Carter responded that she did not respond to Harold's prior email because she was on leave.  *See id.* at 43.  She also criticized Harold for "wait[ing] eleven days before [she was] to travel . . . to decide to change who was going and . . . question[] [her] authorization."  *Id.*  Nine days later, on January 14, Carter emailed Harold again to say that she "was not able to conduct the scheduled training because of the confusion [she] always encounter[s] when [she is] to instruct a training class that involves travel."  *Id.* at 21.  She added that she did not understand why another Customer Service Manager could not have taken her place on the trip.[2]  *See id.*  Carter did not mention her health in any of the above emails.  *See id.* at 18, 21, 43.

---

[2] The Agency employed two other Customer Service Managers, both of whom were Caucasian and under the age of forty.  *See* Carter EEO Aff. at 13.  Arnold stated in his EEO Affidavit that one of the Customer Service Managers was already scheduled to conduct a different training at the relevant time.  *See* Arnold EEO Aff. at 5.  The other told him that "find[ing] appropriate childcare for her two minor children on less than one week's notice would pose an undue hardship for her."  *Id.*  Carter does not dispute either explanation here.

On January 29, Arnold sent an email to a human resources specialist that described a recent conversation with Carter.  *See id.* at 13, 20.  "At no point in the conversation," wrote Arnold, "did [Carter] assert a reason [for her recent actions] other than she was just unwilling to do the training."  *Id.* at 20.  He added that, in his understanding, Carter had refused to conduct the trainings solely because Minor could not accompany her.  *See id.*

On March 15, 2016, the Department of State gave Carter a proposed letter of suspension for failing to conduct the January 2016 trainings.  *See id.* at 11–14.  In her response, Carter alleged that the suspension was in retaliation for "the current EEO case [she had] pending" with Harold and Arnold, as well as for Minor's separate union grievance against them.  *Id.* at 34.  Carter also stated that she did not conduct the trainings because the "last minute changes and unpredictability" affected her health.  *Id.* at 35; *see also id.* (citing her "medical condition and the mental anguish [she] endured").  On June 15, 2016, Marjorie Ames, the Executive Director of the Bureau of Consular Affairs, approved Carter's three-day suspension.  *See id.* at 64–68.  Ames declined to credit Carter's reliance on her medical condition because Carter "provided insufficient evidence" that she refused travel "due to [that] condition," and also because Carter did not "provide[] such information to [her] chain of command at the time as a reason for [her] inability to attend the training."  *Id.* at 67.

In her performance review for 2015, Carter received a rating of "Exceeds Expectations," as opposed to the highest rating, "Outstanding."  Def.'s Statement of Facts ¶¶ 21–22.  Ma told Carter that she did not receive a higher rating because she "had issues with program development and outreach, management and program team participation, achieving organizational results, and participation and teamwork."  *Id.* ¶ 27.  Carter later indicated she could not remember any factual errors in her evaluation.  *See id.* ¶ 25.

**B.       Procedural Background**

Carter filed a formal EEO complaint with the Department in April 2016.  *See* Formal Compl. of Discrim.  Her complaint alleged that her supervisors denied her a reasonable accommodation when they declined to install blinds in her office.  *See* Compl. Ex. 2, Encl. 1 (Final Agency Decision), at 1, 4, Dkt. 1-2 (construing the complaint).  It also alleges that they discriminated against her when they required her to reimburse the costs of her additional day in Alaska, gave her a three-day suspension, and evaluated her as "Exceed[ing] Expectations."  *Id.* at 1.  Finally, it alleges that her supervisors subjected her to a hostile work environment "characterized by, but not limited to inappropriate comments, heightened scrutiny, degrading emails, and management not recognizing her achievements."  *Id.* at 1–2.  On January 28, 2019, the Department issued a final decision, which found that Carter "failed to prove her case of discrimination or hostile work environment . . . because she failed to provide evidence of a nexus between her protected categories and the treatment she received."  *Id.* at 35.

Carter brought this action on April 25, 2019, *see* Dkt. 1, then amended her complaint on September 17, 2020, *see* Dkt. 17.  Here, as before the EEO, Carter alleges that her letter of suspension, rating of Exceeds Expectations, denial of a travel day, and "harassment . . . and questioning her actions" constituted discrimination based on her race, color, disability, and age. *See* Am. Compl. ¶¶ 189–220, 232–239.  She also alleges that the same actions were unlawful retaliation for her participation as a witness in a "prior EEOC hearing."  *Id.* ¶¶ 221–231.  She further raises a failure to accommodate claim related to her requests for office blinds and an extra travel day in Alaska.  *See id.* ¶¶ 240–249.  Finally, she alleges that the Department created a hostile work environment.  *See id.* ¶¶ 250–255.

The Secretary moved for summary judgement on April 13, 2021.  Dkt. 23.  Its motion is now ripe for review, and this Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

## II.    LEGAL STANDARD

Under Rule 56, summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A "material" fact is one that could affect the outcome of the lawsuit.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

A party "opposing summary judgment" must "substantiate [its allegations] with evidence" that "a reasonable jury could credit in support of each essential element of [its] claims."  *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015).  The moving party is entitled to summary judgment if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.    ANALYSIS

### A.    The Discrimination Claims

"Under Title VII, the ADEA, and the Rehabilitation Act, the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because

of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  For an employment action to be "adverse," it must cause "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a . . . significant change in benefits." *Baird v. Gotbaum*, 662 F.3d 1246, 1248 (D.C. Cir. 2011) (citation omitted).  In other words, the "employee must experience[] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Id.* at 1248–49 (citation omitted) (alteration in original).

Where an employee offers only circumstantial evidence of discrimination, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972).  *See Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010).  Under that framework, the employee "must first make out a prima facie case" of discrimination.  *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019).  The burden then shifts to the employer to come forward with a legitimate, non-discriminatory reason for the challenged action.  *See id.*  The issue at that stage is "not the correctness or desirability of the reasons offered but whether the employer honestly believe[d]" them.  *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (alterations, internal quotation marks, and citation omitted).  Finally, if the employer carries that burden, the district court "need not—and should not—decide whether the plaintiff actually made out a prima facie case." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis omitted).  Instead, the court "must conduct one central inquiry in deciding an employer's motion for summary judgment: whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory

reason was not the actual reason [for its action] and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Iyoha*, 927 F.3d at 566 (quoting *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)) (internal quotation marks omitted).

      In her amended complaint, Carter claims that her supervisors discriminated against her when they issued her letter of suspension, rated her as "Exceed[ing] Expectations" on her performance review, denied her reimbursement for her additional day in Alaska, and engaged in both "continued harassment . . . and questioning of her actions."  Am. Compl. ¶ 190.  For the following reasons, this Court will grant summary judgment to the Secretary on each of those claims.

      *1.*    *The Suspension*

      The Secretary gave a legitimate, non-discriminatory reason for Carter's suspension—namely, that Carter refused to conduct a training as scheduled in January 2016.  *See* Ames EEO Aff. at 11–14, 66–68.  Carter first informed Harold of her refusal over email in December 2015. *See id.* at 18.  To explain her decision, she relied solely on the fact that the Agency would not allow her to travel with a particular colleague.  *See id.*  Carter referenced that explanation again in a subsequent email, *see id.* at 43, and further alleged both "confusion" in the Agency processes and "bullying" from Harold, *id.* at 21.  Indeed, Carter did not attribute her decision to her disability until March 2016, when she received a proposed letter of suspension from the Agency.  *See id.* at 34–35.  Based on that record, a reviewing official suspended Carter because she "failed to complete [her] assignment" without adequate justification.  *See id.* at 66–68.  That reason clearly survives the second step of the *McDonnell Douglas* framework.  *See Fischbach*, 86 F.3d at 1183.

No reasonable jury could find that the above rationale was pretextual.  *See Iyoha*, 927 F.3d at 566.  Although Carter argues that the suspending official improperly disregarded her medical issues, *see* Pl.'s Opp'n at 18–19, that official reasonably concluded that Carter "provided insufficient evidence" that those issues prevented her from traveling, especially considering that Carter did not mention them until she received a proposed letter of suspension, Ames EEO Aff. at 67.  *See Brady*, 520 F.3d at 495 ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false" (citation omitted)).  In addition, although Carter notes that the Agency's other two Customer Service Managers were not required to attend the training, *see* Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 19, 22, Dkt. 28, those employees were not similarly situated to Carter.  Carter had greater notice of the training and had agreed to conduct it.  *See* Ames EEO Aff. at 21 (explaining that Carter and her co-workers "discussed which training classes we would take" and assigned them accordingly).  In contrast, one of the other Customer Service Managers was already scheduled to travel to attend a different training session.  *See* Arnold EEO Aff. at 5.  And the other, who had two children, stated that finding childcare with "less than a week's notice would pose an undue hardship for her."  *Id.*  Carter thus failed to show that any similarly situated employee received different or preferential treatment, and the Secretary is accordingly entitled to summary judgment on this claim.

### 2.   The Performance Review

Summary judgment is also appropriate with respect to Carter's performance review because the review itself did not constitute an "adverse employment action."  *Baird*, 662 F.3d at 1248.  Although Carter received a rating of "Exceeds Expectations," as opposed to the most favorable "Outstanding," Def.'s Statement of Facts ¶¶ 21–22, her review was still positive.  She

has not provided evidence that this rating had any impact on her employment, such as preventing her from receiving a promotion or changing her benefits.  And absent such evidence of "significant and objectively tangible harm," Carter cannot establish that the review falls within Title VII's scope.  *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (internal quotation marks omitted); *see also id.* ("[F]ormal criticism or poor performance evaluations are not necessarily adverse actions and they should not be considered such if they did not affect the employee's grade or salary." (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)); *Johnson v. Mao*, 174 F. Supp. 3d 500, 516 (D.D.C. 2016) (finding rating decrease from "commendable" to "successful" did not constitute an adverse employment action where plaintiff did not allege tangible harm).

### 3.  The Travel Day

Turning to the dispute over Carter's additional day in Alaska, the Secretary is correct that Carter failed to exhaust her administrative remedies, *see* Def.'s Summ. J. Mem. at 31–32. Before bringing a Title VII, Rehabilitation Act, or ADEA claim against a federal employer, employees must exhaust their administrative remedies.  *See Payne v. Salazar*, 619 F.3d 56, 58 (D.C. Cir. 2010); *Doak v. Johnson*, 798 F.3d 1096, 1099 (D.C. Cir. 2015); *Rann v. Chao*, 346 F.3d 192, 194–95 (D.C. Cir. 2003).  "To begin that process, the employee generally must contact an EEO counselor to complain about the alleged violation within 45 days of its occurrence." *Koch v. Walter*, 935 F. Supp. 2d 143, 149 (D.D.C. 2013) (citing 29 C.F.R. § 1614.105(a)(1)). Here, although Carter learned on June 22, 2015, that the Secretary would not reimburse her for an additional travel day, *see* Def.'s Statement of Facts ¶¶ 8–9, she did not contact an EEO counselor until September 4, 2015, *see* Final Agency Decision at 2.  Because she waited seventy-

11

three days before contacting the counselor, she failed to exhaust her claim that the Secretary's refusal to reimburse her was discriminatory.[3]  *See Koch*, 935 F. Supp. 2d at 149.

In any event, even if Carter had exhausted her administrative remedies, her challenge to the reimbursement decision would fail under the *McDonnell Douglas* framework.  The Secretary gave a legitimate, non-discriminatory reason for declining to cover the costs of her additional travel day—namely, that Carter agreed to pay them herself.  *See* Def.'s Statement of Facts ¶¶ 10–11.  The Secretary also determined that Carter did not need another day in Alaska to "pack up materials" from her training, as Customer Service Managers usually "do such wrap up activities at the end of a class."  Harold EEO Aff. at 28.  Carter provides no evidence that the above reasoning was pretextual, and her briefing never defends this claim on the merits.  *See generally* Pl's Opp'n.  Accordingly, no reasonable jury could find that the Secretary's approach to the travel day was discriminatory.  *See Iyoha*, 927 F.3d at 566.

### 4.    The Increased Scrutiny

Finally, the Secretary is entitled to summary judgment with respect to Carter's claim of "continued harassment . . . and questioning of her actions."  Am. Compl. ¶ 190.  It is unclear what conduct Carter intended to capture under this claim.  To the extent she is challenging Harold's supervision of her travel schedule, *see* Harold EEO Aff. at 28 (criticizing that supervision), the claim fails for lack "of an adverse employment action," *Baird*, 662 F.3d at 1248.  Carter has provided no evidence that the "alleged increased supervision had any

---

[3] ADEA permits plaintiffs to commence a civil action without exhausting their administrative remedies if they both give the EEOC "not less than thirty days' notice of an intent to file [that] action" and file the action "within one hundred and eighty days after the alleged unlawful practice occurred."  29 U.S.C. § 633a(c)–(d).  Carter does not fall within that provision because she filed this action in April 2019, *see* Compl.—almost four years after the challenged practice occurred, *see* Def.'s Statement of Facts ¶¶ 8–9.

additional effect on the terms, conditions or privileges of [her] employment." *Hunter v. Clinton*, 653 F. Supp. 2d 115, 122 (D.D.C. 2009).  To the extent that she is challenging the "bullying" that culminated in her suspension, Ames EEO Aff. at 21, the claim fails because no reasonable juror could find the suspension to be discriminatory, *see supra* section III.A.1.  Lastly, to the extent that Carter challenges some other conduct, the claim fails because she has neither identified that conduct in her briefing nor assembled record evidence to support it.  *See Potter v. District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (Williams, J., concurring) (remarking that "judges are not like pigs, hunting for truffles buried in briefs or the record" (internal quotation marks and citation omitted)).

### B.    The Retaliation Claims

Title VII prohibits an employer from discriminating against an employee because she has opposed a practice that the statute forbids.  *See* 42 U.S.C. § 2000e-3(a).  Where a plaintiff relies only on circumstantial evidence of retaliation under Title VII, the plaintiff bears the initial burden of establishing a prima facie case of retaliation.  *See Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (per curiam).  To establish a prima facie case of retaliation under Title VII, the plaintiff must show (1) that she engaged in statutorily protected activity; (2) that she was subjected to a materially adverse employment action; and (3) that there is sufficient evidence to infer a causal connection between the protected activity and the employment action.  *Id.* "Adverse actions" in the retaliation context are "not limited to discriminatory actions that affect the terms and conditions of employment," but must be of the kind that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68 (2006) (internal quotation marks and citation omitted).  From there, if the plaintiff states a prima facie case, the burden shifts to the employer

to articulate a "legitimate, nondiscriminatory reason" for the challenged action.  *Wiley*, 511 F.3d

at 155 (internal quotation marks omitted).  Finally, if the employer articulates a

nondiscriminatory justification, "the burden-shifting framework disappears, and a court

reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from

all the evidence."  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (internal quotation

marks omitted).

> Carter's retaliation claims fail for the similar reasons as her corresponding discrimination

claims.  First, as discussed above, the Secretary has articulated a non-discriminatory reason for

Carter's suspension, and Carter has not shown that that reason was pretextual.  *See supra* section

III.A.1.  Accordingly, a reasonable jury could not infer that retaliation was the cause of Carter's

suspension.  *See Jones*, 557 F.3d at 677.  Second, although Carter alleges that her performance

appraisal was lowered from "Outstanding" to "Exceeds Expectations" in retaliation for protected

activity, Am. Compl. ¶¶ 35–38, 223, she still received a favorable review, *see* Def.'s Statement

of Facts ¶¶ 21–22, and has provided no evidence that the lower rating caused tangible

consequences.  Thus, the lower rating would not dissuade a reasonable employee from making or

supporting a charge of discrimination.  *See Cole v. Boeing Co.*, 75 F. Supp. 3d 70, 81 (D.D.C.

2014), *aff'd*, 621 F. App'x 10 (D.C. Cir. 2015) ("An average performance evaluation . . . may not

rise to the level of a materially adverse action absent evidence that the evaluation affected an

employee's 'position, grade level, salary or promotion opportunities' or [was] 'attached to

financial harms.'" (quoting *Taylor v. Solis*, 571 F.3d 1331, 1321 (D.C. Cir. 2009))).  Third,

Carter failed to exhaust her administrative remedies relating to the denial of a travel day.  *See*

*supra* section III.A.3.  And even if she had exhausted them, no reasonable employee could find

that the Secretary's approach to the travel day was materially adverse.  *See Burlington*, 548 U.S.

at 68.  Finally, although Carter does not specify what conduct constituted "continued harassment . . . and questioning," Am. Compl. ¶ 190, this Court has previously held that "increased scrutiny" and "surveillance" did not constitute adverse action for the purpose of a retaliation claim. *Guillen-Perez v. District of Columbia*, 415 F. Supp. 3d 50, 63 (D.D.C. 2019).  Absent evidence of any tangible consequences from the conduct that Carter challenges, the same determination is appropriate here.

### C.  The Failure to Accommodate Claim

"To make out a prima facie case of discrimination based on a failure to accommodate, a 'plaintiff must demonstrate by a preponderance of the evidence: (1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of her job; and (4) that the employer refused to make such accommodations.'"  *McNair v. District of Columbia*, 359 F. Supp. 3d 1, 8 (D.D.C. 2019) (quoting *Etheridge v. FedChoice Fed. Credit Union*, 789 F. Supp. 2d 27, 35 (D.D.C. 2011)).

Identifying a reasonable accommodation often requires an "interactive process" between an employer and employee.  *Minter v. District of Columbia*, 809 F.3d 66, 69 (D.C. Cir. 2015); *see also* 29 C.F.R. § 1630.2(o)(3).  The purpose of that process is for "both parties to reach agreement on the appropriate reasonable accommodation and, to the extent necessary, for the employer to determine whether the employee does indeed have a . . . disability."  *Ali v. McCarthy*, 179 F. Supp. 3d 54, 77 (D.D.C. 2016), *aff'd sub nom. Ali v. Pruitt*, 727 F. App'x 692 (D.C. Cir. 2018).  In evaluating failure-to-accommodate claims, courts "look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary."  *Ward*, 762 F.3d at 32

(citation omitted).  Accordingly, for Carter to show that her requests for accommodations were "refused," *McNair*, 359 F. Supp. 3d at 8, she "must show either that the [Secretary] in fact ended the interactive process or that it participated in the process in bad faith," *Minter*, 809 F.3d at 69 (quoting *Ward*, 762 F.3d at 32).

Here, although the Department informed Carter of the paperwork necessary to request blinds for her office, Carter declined to complete it.  *See* Def.'s Statement of Facts ¶¶ 1–6. Carter does not identify any evidence that the Department made the paperwork unduly burdensome, hindered her ability to complete it, or otherwise acted in bad faith.  By declining to participate her workplace's process for issuing reasonable accommodations, Carter thus failed "to make reasonable efforts to help the other party determine what specific accommodation [we]re necessary" and "obstructed the process."  *Ward*, 762 F.3d at 32 (citations omitted).  For that reason, no reasonable juror could find that the Secretary, rather than Carter, was responsible for the breakdown in the interactive process.  *See id.*; *see also Ali*, 179 F. Supp. 3d at 77–78 (finding plaintiff responsible for a breakdown in the interactive process where he failed to both complete forms requested by agency and submit requested medical documentation).

Carter argues that an interactive process was unnecessary because "there are some accommodations that are so obvious that a solution can be developed" without one.  Pl.'s Opp'n at 13.  But although it was presumably obvious that Carter had an oxygen tank, the connection between that tank and office blinds requires explanation.  In this respect, Carter's request for office blinds is distinguishable from the D.C. Circuit's example of an "obvious" accommodation: an employee "confined to a wheelchair" who requested aid in getting to a workstation "accessible only by climbing a steep staircase," *Ward*, 762 F.3d at 31 (quoting *Langon v. Dep't of Health & Hum. Servs.*, 959 F.2d 1053, 1058 (D.C. Cir. 1992)).  And because Carter's need for

office blinds was "not obvious," the Department was permitted to require that she "provide documentation of the need for [that] accommodation." *Id.* at 31–32 (citation omitted). Summary judgment is thus appropriate on Carter's claim that the Department violated the Rehabilitation Act by declining her request for office blinds.[4] *See* Am. Compl. ¶ 244.

Summary judgment is also appropriate on Carter's claim that the Department failed to accommodate her by denying her an extra travel day in Alaska. *See id.* ¶ 245. Carter has not shown that she requested that travel day as an accommodation for her disability. *See Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999) ("An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied."). Accordingly, she has failed her burden of showing an exhaustion of administrative remedies. *See Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006).

### D.      The Hostile Work Environment Claim

To prevail on a hostile work environment claim, "a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In reviewing that showing, "court[s] look[ ] to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Id.* (citation omitted). Because Title VII is

---

[4] Given this disposition, the Court need not address the Secretary's argument that the requested accommodation was unrelated to Carter's disability. *See* Def.'s Reply in Supp. of its Mot. for Summ. J. at 5–6, Dkt. 31. Likewise, the Court need not address whether Carter eventually received the office blinds she requested. *See* Pl.'s Opp'n at 14.

not a "general civility code," the challenged conduct "must be [so] extreme [as] to amount to a change in the terms and conditions of employment," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted).  In addition, the plaintiff "must establish that [the] allegedly harassing conduct . . . was based on a protected characteristic," or that there is "some linkage between the hostile behavior and [her] membership in a protected class."  *Byrd v. Vilsack*, 931 F. Supp. 2d 27, 45 (D.D.C. 2013) (Wilkins, J.) (citing *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1123 (D.C. Cir. 2002); *Motley–Ivey v. District of Columbia*, 923 F. Supp. 2d 222, 233 (D.D.C. 2013)).

Carter alleges that she was subjected to a "hostile work environment when management made accusations against [her] of stealing, fraud, denial of overtime, denial of service in the Acting Assistant Director role, denial of telework, leave scrutiny, and bullying."  Am. Compl. ¶ 251.  That phrase is difficult to follow because it is the only language in her complaint to reference "stealing," "fraud," a "denial of service in the Acting Assistant Director role," or a "denial of telework."  *See generally* Am. Compl.  Carter's briefing also offers no argument in support of on her hostile work environment claim.  *See generally* Pl.'s Opp'n.  Nevertheless, upon review of the record, the Court interprets her complaint to allege a hostile work environment based on: (1) her suspension; (2) her denial of a travel day; (3) her conversations with Harold about those events; (4) an occasion on which "Harold asked [her] to take a detail to another office, Am. Compl. ¶ 157; (5) an occasion on which Harold told her "she could no longer work overtime," *id.* ¶ 161; (6) an occasion on which "Harold started questioning [her] about her leave slips," *id.* ¶ 149; (7) an occasion on which "Harold changed the policy of how leave requests were to be submitted," *id.* ¶ 155; (8) an occasion on which Harold told Carter not to telework, *see id.* ¶¶ 93, 251; (9) and other unspecified conversations with Harold, which Carter

characterized as "bullying," *id.* ¶¶ 114, 116, 251.  *See also* Pl.'s Responses to Def.'s

Interrogatories at 5 (listing the events that Carter she to form a hostile work environment).

The above conduct did not create a hostile work environment.  This Court has already

rejected Carter's claims that her suspension and denial of a travel day were discriminatory.  *See*

*supra* sections III.A.1, III.A.3.  For the same reasons discussed above, those events cannot

contribute to a hostile work environment, which requires "some linkage between the hostile

behavior and [Carter's] membership in a protected class."  *Byrd*, 931 F. Supp. 2d at 45.

Moreover, many of Carter's remaining allegations lack support in the record.  For example,

Harold did not press Carter to take a detail in another office, but merely alerted her to a position

that "might be a nice opportunity for [her.]"  Carter EEO Aff. at 86.  No Agency employee

prevented Carter from working overtime as a general matter, *see* Carter EEO Aff. at 93–100, but

only prevented her from doing so on specific dates when "there [was] not enough work," *id.* at

93–94, 100.  Carter admits that Harold changed the Agency's policy on leave requests for all

senior staff.  *See* Am. Compl. ¶¶ 154–55.  And whereas Carter has not identified a single

communication from Harold that was hostile or abusive, Harold appears to have addressed Carter

in a polite and professional manner, *see, e.g.*, Ames EEO Aff. at 18, 26 (discussing Carter's

refusal to conduct the California training).  Finally, even if Carter could prove the above

allegations, their substance did not "alter the conditions of [her] employment and create an

abusive working environment."  *Baloch*, 550 F.3d at 1201 (internal quotation marks and citation

omitted).  They are instead a series of "work-related actions by supervisors," which "courts

typically do not find . . . to be sufficient for a hostile work environment claim."  *Munro v.*

*LaHood*, 839 F. Supp. 2d 354, 366 (D.D.C. 2012) (citation omitted).  The Secretary is

accordingly entitled to summary judgment on Carter's hostile work environment claim.

**CONCLUSION**

For the foregoing reasons, the Secretary's Motion for Summary Judgment is granted.  An order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

March 31, 2022